UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OS AMERICA, | ) | Civil No.06CR2158 JM |
| Plaintiff, | ) | |
| v. | ) | **ORDER DENYING MOTIONS TO** |
| | ) | **SUPPRESS EVIDENCE AND** |
| **LUIS GILARDO PAYAN-VALENZUELA** | ) | **STATEMENTS** |
| **(1); PEDRO MOYTEZ-PINEDA (2),** | ) | |
| Defendants. | ) | |

*Procedural Background*

This is a prosecution based on an indictment containing two counts against each Defendant for importation of marijuana and possession of marijuana with intent to distribute.

Pretrial motions brought by Defendants Luis Gilardo Payon-Valenzuela and Pedro Moytez-Pineda to suppress evidence and statements have generated several rounds of evidentiary hearings and filings.  On May 10, 2007, U.S. Border Patrol agents Mark Battaglini, Jorge Vega-Torres (Vega), Jesus Salazar, and David Blake testified primarily on their observations and stop of the vehicle in which Defendants were occupants.  Their testimony largely concerned Defendants' motion to suppress evidence on the grounds of insufficient legal cause to stop the vehicle and the manner in which the vehicle was stopped. The next evidentiary hearing occurred on June 1, 2007 and focused on the motion to suppress statements. Drug Enforcement Adminis-

tration Special Agent Michael Ortiz, who conducted the post-Miranda interviews of the Defendants, testified. The defense called Border Patrol agent (BPA) Jesus Salazar as well as a defense investigator. Yet a third evidentiary hearing was conducted on July 26, 2007.  This hearing was occasioned by a declaration filed by BPA Salazar following the second evidentiary hearing of June 1.  Because Salazar's declaration was inconsistent with his June 1 testimony on material points, this court ruled it was appropriate to afford Defendants the opportunity to cross-examine Salazar further in lieu of striking his declaration.  At the third and final evidentiary hearing, Defendant Moytez-Pineda also testified.

### *Factual Background*

The Imperial Sand Dunes (Dunes) known by the United State Border Patrol to be a smuggling corridor for illegal aliens and drugs, in the Southern District of California, straddles the United States and Mexico, and is situated approximately nine miles from the Andrade Port of Entry and approximately 35 miles from the Calexico Port of Entry.  An area known as Buttercup Valley extends from Mexico on the south in a  northward direction across the international border.  Buttercup Valley is a relatively flat valley surrounded by the Dunes that rise to approximately 200 feet.  Because the topographic severity of the Dunes in the area of the border acts as a natural barrier, there is no man made barrier separating the United States from Mexico. Spaced, concrete monuments in the sand delineate the international boundary. Buttercup Valley extends northward, bordered by tall dunes, ultimately toward the Buttercup campground area. The Buttercup Campground area in turn is accessible to Interstate 8 at a point approximately 15 miles west of Yuma, Arizona.

Conventional vehicles, including those with four-wheel drive and sport utility vehicles cannot traverse the tall dunes. The only path of travel for such a vehicle traveling from the Mexican Buttercup to the Buttercup campground area on the United States side is through the lower middle dunes into a small trail leading into the Buttercup campground area.

On September 20, 2006, a U.S. Border Patrol anti-smuggling unit known as the Smuggling Target & Action Team (STAT), operating out of the Calexico station of the U.S. Border Patrol, was conducting surveillance of the Buttercup campground and surrounding area for the

06cr2158

1  purpose of detecting smuggling activity. Agent Michael Harrington arrived at approximately
2  8:00 a.m., drove into Buttercup Valley to insure there were no "legitimate vehicles" inside the
3  valley and then exited the valley to assume a point of surveillance at the north end of Buttercup
4  Valley.  Agent Harrington maintained constant visual surveillance of the valley and surrounding
5  dunes.  When supervising Border Patrol Agent Marc Battaglini assumed Agent Harrington's
6  observation position at approximately 12:30 p.m., Agent Harrington reported that there had been
7  no vehicular traffic at all in the surveillance area that day.

8       Upon assuming his concealed surveillance position, Agent Battaglini observed that there
9  were no vehicles or people present in the Buttercup Valley and the surrounding dunes.  After
10 maintaining constant surveillance of the area, however, circumstances changed at approximately
11 4:00 p.m. when Agent Battaglini and other STAT members noticed certain vehicles engaged in
12 "looping" activity between two freeway exits of Interstate 8 "in front of the Buttercup area".
13 Agent Battaglini, based on his substantial enforcement experience in the area, recognized this
14 activity as "common scouting behavior by the narcotics smugglers" designed to detect marked
15 and unmarked law enforcement vehicles. Based upon Agent Battaglini's observations and
16 experience, he, as well as other STAT agents, suspected a load of narcotics would be coming
17 through the Dunes.

18      After observing the suspicious "looping activity" of certain vehicles on the freeway,
19 Agent Battaglini then noticed an all-terrain vehicle (ATV) rider riding out of Buttercup Valley to
20 a higher point in the sand dunes where he parked in a partially concealed manner.  Agent
21 Battaglini had, on more than a dozen occasions, observed ATV riders utilized in this manner to
22 scout for law enforcement vehicles in advance of a vehicle smuggling narcotics across the
23 border.  A short time later, Agent Battaglini observed a silver Honda SUV drive out of the
24 Buttercup Valley. The Honda SUV had "blacked out" windows, missing a front license plate,
25 and bore no "flag" as required for off-road vehicles traversing the sand dunes. The Honda SUV
26 thereafter traversed the paved frontage road by Interstate 8 and then entered eastbound Interstate
27 8 at the Gray's Well on-ramp.  Prior to September 20, 2006, Agent Battaglini had been involved
28 in numerous arrests for marijuana smuggling in this area based upon similar observation of

looping scout vehicles on the freeway in advance of a marijuana load vehicle emerging from Buttercup Valley. Agent Battaglini immediately suspected the Honda SUV had illegally entered the United States and was smuggling marijuana.

Based upon the observations and substantial experience of Agent Battaglini and his fellow STAT members, a decision was made to stop the Honda SUV and detain its occupants. A controlled tire deflation device (CTDD), also known as a "spike strip," was ultimately utilized. As explained by Agent Battaglini, a CTDD consists of a plastic strip containing small hollow steel tubes. When a vehicle passes over a deployed strip, one or more of the tubes will dislodge from the strip, embed in a tire, and cause air to escape at a controlled rate of deflation. A driver is able to retain control of the vehicle while tire deflation takes place and may continue driving for some distance. On the approximately 100 prior occasions Agent Battaglini had personally deployed or witnessed the deployment of a CTDD, he had never observed a device cause an accident.[1]

After allowing for normal freeway traffic to clear and the Honda SUV to pass by points along eastbound I-8 where load vehicles had attempted to elude authorities in the past[2], the agents deployed a  CTDD was deployed to stop the Honda SUV. Once the CTDD was success-fully deployed Agents Blake and Salazar, who had been following the Honda SUV, activated the lights and sirens on their unmarked vehicles and the Honda SUV quickly pulled to the shoulder of the freeway just west of Yuma.

Agents Salazar and Blake, respectively, approached the passenger and driver sides of the stopped Honda SUV from the rear and with their service firearms drawn[3].  When the passenger, Defendant Moytez-Pineda open the passenger door, a strong odor of marijuana was detected by

---

[1]Agent Battaglini did testify that he once observed a vehicle roll over while trying to evade a CTDD.

[2]The Honda SUV traveled approximately 15 miles on Interstate 8 at the approximate speed of 60 mph before it was ultimately stopped.

[3]Testimony from the several agents established that it was generally understood by all that it was to be a felony stop, with weapons drawn and suspects handcuffed. This procedure had become the standard method of apprehension of suspected load vehicles emerging from the Buttercup Valley area under similar circumstances. Testimony of the agents was consistent in that in all such cases the vehicles stopped were ultimately determined to be marijuana load vehicles.

06cr2158

1  Agent Salazar.  As Defendant Moytez-Pineda stepped out of the vehicle, Agent Salazar observed

2  bundles behind the seat which he believed to contain marijuana. Agent Blake noticed a strong

3  odor of marijuana when the driver, Defendant Payan-Valenzuela, opened his door. Both

4  Defendants were placed on the ground and handcuffed.  Each Defendant was questioned

5  regarding immigration status without being <u>Mirandized</u> and admitted, in essence, to being a

6  Mexican citizen with no authorization to be in the United States.  Defendants were placed under

7  arrest and transported separately in unmarked vehicles to the Calexico-U.S. Border Patrol

8  station.[4]

### *Advisal of Administrative and Miranda Rights*

10  At the June 1, 2007 evidentiary hearing, Agent Salazar testified he was unable to recall

11  whether he advised Defendants of their administrative removal rights (or whether he used Form

12  I-826 in connection therewith), although he did testify it was his custom and practice to do so

13  when encountering a deportable alien. The relevance of this line of questioning, vigorously

14  pursued by counsel for Defendant Moytez-Pineda, was that if such an administrative advisal had

15  been given before any <u>Miranda</u> warning, the administrative advisal that counsel could be

16  present, but not at government expense, would conflict with the standard <u>Miranda</u> admonition

17  thereby creating confusion for the Defendant.  As such, counsel argued, the rule of <u>United States</u>

18  <u>v. San Juan-Cruz</u>, 314 F.3d 384 (9th Cir. 2002) would come into play.  (Holding that a <u>Miranda</u>

19  advisement of the right to appointed counsel must be clear and not subject to any equivocation

20  resulting from a prior or contemporaneous administrative advisal of the right to have an attorney

21  present, but not at government expense.)

22  Later, at the July 26, 2007 evidentiary hearing, Agent Salazar testified that following the

23  June 1 hearing he conducted further investigation into whether and when he provided any

24  administrative removal rights to either Defendant. In fact, Agent Salazar was able to retrieve an

25  I-826 form he utilized to advise each Defendant of his administrative rights.  Agent Salazar

26  further testified that the times entered on each form (6 p.m. for Defendant Moytez-Pineda and 7

27

28
---
[4]Although the testimony was unclear on the objects used to cover Defendants' heads during transportation, it seems clear that either a hood or an article of clothing was thus utilized for each Defendant in order to prevent their observations of the unmarked vehicles used in this case.

06cr2158

1    p.m. for Defendant Payan-Valenzuela) reflected the times the forms were input into a computer

2    and not when the administrate advisements were given.  Agent Salazar then elaborated that it

3    had always been his practice, without exception, to issue administrative rights after <u>Miranda</u>

4    rights when the agent was aware, as in this case, that the case was being processed as a criminal

5    case.  Defendant Moytez-Pineda testified briefly that the Form I-826 was shown to him by Agent

6    Salazar at approximately 6:00 to 6:30 p.m. and that he was later interviewed by DEA agents.

7    Defendant Moytez-Pineda was able to identify his signature on the I-826 form. On cross-

8    examination, Defendant Moytez-Pineda testified that he cannot read.

9         Agent Michael Ortiz of the Drug Enforcement Administration responded to the Calexico

10   Border Patrol station at approximately 8:15 p.m. on September 20, 2006.  At approximately 8:50

11   p.m., the <u>Miranda</u> admonition was provided to Defendant Moytez-Pineda by DEA agent

12   Vasquez through the use of a standard "<u>Miranda</u> card".  Defendant Moytez-Pineda acknowl-

13   edged his <u>Miranda</u> rights and then agreed to speak whereupon he gave a statement.[5]

14        Following the completion of Defendant Moytez-Pineda's interview, Agent Ortiz next

15   advised Defendant Payan-Valenzuela of his <u>Miranda</u> rights. Defendant Payan-Valenzuela

16   indicated he understood and waived his <u>Miranda</u> rights.  He then provided a statement. The

17   interview of Defendant Payan-Valenzuela then began at approximately 9:30 p.m. and concluded

18   at approximately 10:00 p.m.

19                                    ***Discussion***

20        The parties in this case fundamentally disagree on how the threshold analysis for these

21   motions to suppress evidence and statements should be structured.  The government submits that

22   only reasonable suspicion was required for Defendants' vehicle to be stopped and further that the

23   use of a CTDD was justified under either a reasonable suspicion or probable cause standard.

24   Defendants contend, alternatively, that probable cause at the very least was required for the stop

25

26        [5]Neither Defendant claims his <u>Miranda</u> advisement was in any way deficient or that any
     statement was the product of coercive tactics at the time of the interviews. Rather, Defendants argue the
27   manner in which their vehicle was stopped tainted their later statements and that the rule of <u>San Juan-
     Cruz</u> was violated.
28        Agent Ortiz testified that Defendants were calm during their respective interviews, were
     provided food and beverage as required and communicated appropriately.

6                                                                                      06cr2158

and, moreover, given the use of the CTDD and drawn weapons, the more appropriate standard should have been one of clear and convincing evidence that narcotics were being transported in the vehicle.

Defendants further argue that the "field questions" asked of Defendants relating to citizenship status were impermissible due to the asserted unconstitutional stop of the vehicle and that later post-Miranda statements were tainted by the stop. The government responds that the "field questions" were proper and that neither the stops nor the field questioning render the post-Miranda statements inadmissable.

After careful consideration of all the evidence addressed regarding these motions as well as the written submissions and oral arguments, this court finds that although only reasonable suspicion was required for the stop of the vehicle in which Defendants were occupants, the stop was justified under either a reasonable suspicion or probable cause standard.

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government and the reach of that protection extends to investigatory stops of people and vehicles that fall short of arrests.  United States v. Arvizu, 534 U.S. 266, 273 (2002).  Reasonable suspicion exists for an investigatory stop of a vehicle when the officer is aware of specific articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that the person to be detained has committed or is about to commit a crime. See United States v. Cortez, 449 U.S. 411, 417-418 (1981); United States v. Salinas, 940 F.2d 392, 394 (9th Cir. 1991). Facts are to be interpreted in light of the experience of a trained officer, and the entirety of relevant circumstances must be considered. United States v. Sokolow, 490 U.S.1, 7-8 (1989).

The Supreme Court has established a non-exclusive list of factors upon which an officer may rely in concluding reasonable suspicion exists: (1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including obvious attempts to evade officers; (6) appearance or behavior of the passengers; (7) model and appearance of vehicle; and (8) officer experience. United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975).  However, the "totality of the circumstances" of each case must be considered to determine whether the detaining officer

1  has a particularized and objective basis for suspecting illegal activity.  <u>United States v. Arvizu</u>,

2  534 U.S. 266, 273-274 (2002).

3       Here, the factors supporting reasonable suspicion to stop and detain Defendants' vehicle

4  were numerous and compelling. The STAT unit conducting surveillance into the Buttercup area

5  on September 20, 2006 consisted of several highly experienced Border Patrol agents familiar

6  with smuggling activity in this area with close proximity to the border.  These agents knew how

7  to conceal themselves and what signs to look for indicating smuggling activity.  Before

8  September 20, 2006, the agents had become familiar with the looping maneuvers of scout

9  vehicles on Interstate 8 adjacent to Buttercup, as well as ATV riders riding scout in the dunes in

10  advance of a load vehicle emerging from Buttercup Valley into Buttercup campground.  On

11  September 20, 2006, after approximately eight hours of continuous surveillance, the STAT team

12  detected suspicious scouting activity.  Because no vehicular traffic had entered the Buttercup

13  area earlier, the agents quickly and justifiably concluded that Defendants' vehicle, a Honda

14  SUV, emerging from the dunes with blacked out windows, missing a front license plate as well

15  as the customary flag required of off-road vehicles, was in fact, a narcotics load vehicle which

16  had entered the United States by illegally crossing the border at the lower Buttercup area.

17       The scouting activity, the manner in which the Honda SUV was being operated, the

18  vehicle's appearance all fit the familiar and specific profile for drug smuggling. The determina-

19  tion of the agents was buttressed by their experience in which virtually every vehicle of the

20  many vehicles stopped under similar circumstances had been determined to be smuggling

21  narcotics.  Reasonable suspicion abounded to strip the vehicle on Interstate 8 and detain

22  Defendants[6].

23       Defendants urge the court to conclude that the use of the CTDD and drawn weapons in

24  this case was unreasonable and overly intrusive under the Fourth Amendment. Under the

25  circumstances presented, however, neither the use of the CTDD before agents activated their

26  emergency equipment, nor their use of firearms upon initial contact with Defendants constituted

27

28      [6]Given the compelling factors supporting a determination that the vehicle was smuggling drugs, the stop and detention would have been justified even under the higher standard of probable cause.

8

excessive force. The evidence before the court is that past use of this CTDD, or spike strip, had

resulted in the slow and controlled reduction of air from a tire, rather than tire blow-outs or

vehicle accidents.  Moreover, the testimony of the agents supported the decision to wait until

Defendants' vehicle had passed certain escape points used by past load vehicles and was clear of

legitimate traffic. The tactical use of the CTDD allowed the agents to bring the vehicle to a point

of rest at an optimum location while reducing the potential for escape and risk to other traffic.

See United States v. Hernandez-Garcia, 284 F.3d 1135, 1140 (9th Cir. 2002).  (Holding no basis

for invalidating an arrest or suppressing evidence where a CTDD was deployed under similar

circumstances).

Next, neither the use of drawn firearms in the approach of this vehicle, nor the initial use

of handcuffs converted the stop into a custodial arrest or Fourth Amendment violation. United

States v. Cervantes-Flores, 421 F.3d 825 (9th Cir. 2005) (Circumstances justified use of

handcuffs in a Terry stop without converting the contact into an arrest); United States v.

Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(permitting the display of firearms and the use

handcuffs during a Terry stop when officers had reason to believe the suspect was dangerous).

Here, the high probability that Defendants were smuggling a load of narcotics into the United

States from Mexico justified the agents' decision to make a felony stop of the vehicle. The use of

drawn weapons and handcuffs enhanced the ability of the agents to quickly control the scene,

prevent escape, and retrieve risk of injury to the public as well as defendants.

Once Defendants were removed from the vehicle it became quickly apparent to the agents

from the strong odor of marijuana emanating from the vehicle and their observations of packages

in the rear seat area that Defendants were smuggling marijuana. The continued detention of

Defendants, as well as the roadside questioning of Defendants into their immigration status was

entirely justified. Berkemer v. McCarty, 468 U.S. 420, 435-40 (1984) (roadside questioning of a

motorist detained pursuant to a traffic stop does not constitute custodial interrogation for

Miranda purposes); United States v. Galindo-Gallegos, 244 F.3d 728, 730-732, (9th Cir.

2001)(border patrol agents' apprehension of Defendant and their questioning of his immigration

status was a proper Terry stop); United States v. Camargo, 177 F.3d. 1113, 1121-23 (9th Cir.

1999) (immigration questioning of detainee following vehicle stop did not amount to custodial

interrogation).  Any statements made by Defendants regarding their immigration status were

properly obtained and admissible.

Next, Defendants urge this court to suppress later post-<u>Miranda</u> statements due to the

manner in which the vehicle stop was conducted, the fact that the heads of Defendants were

covered while they were transported to the Border Patrol station, and because Defendants were

allegedly advised of their administrative rights in a manner that may have undermined the

message of the <u>Miranda</u> advisement.

This court has already analyzed and approved the manner in which Defendant's vehicle

was stopped and Defendants were arrested.  The use of hoods or articles of clothing to cover

Defendants' faces during transportation in order to protect the identity of the undercover

vehicles appeared justified under the circumstances. There is no evidence before the court that

this protective measure was pre-textual, coercive, or in any manner a factor in Defendants'

decisions to provide post-Miranda statements.  The motion to suppress statements, insofar as it is

predicated upon the use of hoods or clothing to impair the vision of Defendants during

transportation, is denied.

Finally, we reach the issue of whether Defendants' post-<u>Miranda</u> statements should be

suppressed either because (1)the <u>Miranda</u> advisement was unclear due to the timing of the

administrative advisement, or (2) the statements were involuntary.

Defendants urge this court to find that they were each advised of their administrative

rights before their respective <u>Miranda</u> advisements or in such a way as to have created confusion

of the type criticized in <u>U.S. v. San Juan-Cruz</u>, 314 F.3d 384, 388-89 (9th Cir. 2002) (a <u>Miranda</u>

warning is defectively unclear when it is preceded by an advisal of administrative removal rights

wherein the individual is informed there is no right to government provided counsel).  The

difficulty with Defendants' argument, however, is that it is dependent upon this court finding

that their <u>Miranda</u> warnings were conveyed in the manner condemned by <u>San Juan-Cruz</u>.

Although the initial testimony of Agent Salazar demonstrated his inability to recall whether he

utilized a certain form (I-826) in providing to Defendants their administrative removal advisal,

06cr2158

as well as other details, his subsequent investigation refreshed his memory on these points. Agent Salazar was later able to provide copies of the I-826 forms he used to process Defendants for administrative purposes and to testify as to his use of the forms. Agent Salazar was vigorously cross-examined on the I-826 forms he utilized for Defendants as well as on his refreshed memory that he provided administrative advisals *after* the post-<u>Miranda</u> interviews of Defendants conducted by DEA agents. Agent Salazar testified that in order to specifically avoid the prospect of an unclear <u>Miranda</u> warning (as discussed in <u>San Juan-Cruz</u>) it was his consistent practice to defer the giving of an administrative removal admonition until after the <u>Miranda</u> warnings and any interview into possible criminal wrongdoing. After Agent Salazar's testimony regarding the I-826 forms (including his explanation of the 6:00 p.m. and 7:00 p.m. posted times on the forms) and his custom and practice of deferring the administrative warning until after the <u>Miranda</u> interview period, this court finds that the weight of the evidence establishes no <u>San Juan-Cruz</u> error occurred[7].

The preponderance of evidence before the court establishes that Defendants were each properly advised of their <u>Miranda</u> rights and that each knowingly, voluntarily, and intelligently waived those rights at the time they provided statements to DEA Agent Ortiz. Moreover, the evidence establishes that each of the Defendants was interviewed by Agent Ortiz in a non-coercive manner and environment.

For all of the foregoing reasons, the motions to suppress evidence and statements are denied in their entirety as to each Defendant.

IT IS SO ORDERED.


DATED:  September 14, 2007

_____
Hon. Jeffrey T. Miller
United States District Judge

---

[7]Agent Salazar's testimony on this subject was more credible than that testimony of Defendant Moytez-Pineda.  Defendant Moytez-Pineda did not note the time he reviewed the I-826 Form with Agent Salazar, and did not testify as to any confusion about his <u>Miranda</u> right to have government counsel appointed for him.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

12

UNITED STATES OS AMERICA,

13
               Plaintiff,

14
v.

15
**LUIS GILARDO PAYAN-VALENZUELA
(1); PEDRO MOYTEZ-PINEDA (2),**

16
               Defendants.

17

Civil No.06CR2158 JM

**ORDER DENYING MOTIONS TO
SUPPRESS EVIDENCE AND
STATEMENTS**

18
### *Procedural Background*

19       This is a prosecution based on an indictment containing two counts against each Defen-

20
dant for importation of marijuana and possession of marijuana with intent to distribute.

21       Pretrial motions brought by Defendants Luis Gilardo Payon-Valenzuela and Pedro

22
Moytez-Pineda to suppress evidence and statements have generated several rounds of eviden-

23
tiary hearings and filings.  On May 10, 2007, U.S. Border Patrol agents Mark Battaglini, Jorge

24
Vega-Torres (Vega), Jesus Salazar, and David Blake testified primarily on their observations and

25
stop of the vehicle in which Defendants were occupants.  Their testimony largely concerned

26
Defendants' motion to suppress evidence on the grounds of insufficient legal cause to stop the

27
vehicle and the manner in which the vehicle was stopped. The next evidentiary hearing occurred

28
on June 1, 2007 and focused on the motion to suppress statements. Drug Enforcement Adminis-

tration Special Agent Michael Ortiz, who conducted the post-Miranda interviews of the Defendants, testified. The defense called Border Patrol agent (BPA) Jesus Salazar as well as a defense investigator. Yet a third evidentiary hearing was conducted on July 26, 2007.  This hearing was occasioned by a declaration filed by BPA Salazar following the second evidentiary hearing of June 1.  Because Salazar's declaration was inconsistent with his June 1 testimony on material points, this court ruled it was appropriate to afford Defendants the opportunity to cross-examine Salazar further in lieu of striking his declaration.  At the third and final evidentiary hearing, Defendant Moytez-Pineda also testified.

### *Factual Background*

The Imperial Sand Dunes (Dunes) known by the United State Border Patrol to be a smuggling corridor for illegal aliens and drugs, in the Southern District of California, straddles the United States and Mexico, and is situated approximately nine miles from the Andrade Port of Entry and approximately 35 miles from the Calexico Port of Entry.  An area known as Buttercup Valley extends from Mexico on the south in a  northward direction across the international border.  Buttercup Valley is a relatively flat valley surrounded by the Dunes that rise to approximately 200 feet.  Because the topographic severity of the Dunes in the area of the border acts as a natural barrier, there is no man made barrier separating the United States from Mexico. Spaced, concrete monuments in the sand delineate the international boundary. Buttercup Valley extends northward, bordered by tall dunes, ultimately toward the Buttercup campground area. The Buttercup Campground area in turn is accessible to Interstate 8 at a point approximately 15 miles west of Yuma, Arizona.

Conventional vehicles, including those with four-wheel drive and sport utility vehicles cannot traverse the tall dunes. The only path of travel for such a vehicle traveling from the Mexican Buttercup to the Buttercup campground area on the United States side is through the lower middle dunes into a small trail leading into the Buttercup campground area.

On September 20, 2006, a U.S. Border Patrol anti-smuggling unit known as the Smuggling Target & Action Team (STAT), operating out of the Calexico station of the U.S. Border Patrol, was conducting surveillance of the Buttercup campground and surrounding area for the

06cr2158

1   purpose of detecting smuggling activity. Agent Michael Harrington arrived at approximately

2   8:00 a.m., drove into Buttercup Valley to insure there were no "legitimate vehicles" inside the

3   valley and then exited the valley to assume a point of surveillance at the north end of Buttercup

4   Valley.  Agent Harrington maintained constant visual surveillance of the valley and surrounding

5   dunes.  When supervising Border Patrol Agent Marc Battaglini assumed Agent Harrington's

6   observation position at approximately 12:30 p.m., Agent Harrington reported that there had been

7   no vehicular traffic at all in the surveillance area that day.

8         Upon assuming his concealed surveillance position, Agent Battaglini observed that there

9   were no vehicles or people present in the Buttercup Valley and the surrounding dunes.  After

10  maintaining constant surveillance of the area, however, circumstances changed at approximately

11  4:00 p.m. when Agent Battaglini and other STAT members noticed certain vehicles engaged in

12  "looping" activity between two freeway exits of Interstate 8 "in front of the Buttercup area".

13  Agent Battaglini, based on his substantial enforcement experience in the area, recognized this

14  activity as "common scouting behavior by the narcotics smugglers" designed to detect marked

15  and unmarked law enforcement vehicles. Based upon Agent Battaglini's observations and

16  experience, he, as well as other STAT agents, suspected a load of narcotics would be coming

17  through the Dunes.

18        After observing the suspicious "looping activity" of certain vehicles on the freeway,

19  Agent Battaglini then noticed an all-terrain vehicle (ATV) rider riding out of Buttercup Valley to

20  a higher point in the sand dunes where he parked in a partially concealed manner.  Agent

21  Battaglini had, on more than a dozen occasions, observed ATV riders utilized in this manner to

22  scout for law enforcement vehicles in advance of a vehicle smuggling narcotics across the

23  border.  A short time later, Agent Battaglini observed a silver Honda SUV drive out of the

24  Buttercup Valley. The Honda SUV had "blacked out" windows, missing a front license plate,

25  and bore no "flag" as required for off-road vehicles traversing the sand dunes. The Honda SUV

26  thereafter traversed the paved frontage road by Interstate 8 and then entered eastbound Interstate

27  8 at the Gray's Well on-ramp.  Prior to September 20, 2006, Agent Battaglini had been involved

28  in numerous arrests for marijuana smuggling in this area based upon similar observation of

looping scout vehicles on the freeway in advance of a marijuana load vehicle emerging from Buttercup Valley. Agent Battaglini immediately suspected the Honda SUV had illegally entered the United States and was smuggling marijuana.

Based upon the observations and substantial experience of Agent Battaglini and his fellow STAT members, a decision was made to stop the Honda SUV and detain its occupants.  A controlled tire deflation device (CTDD), also known as a "spike strip," was ultimately utilized. As explained by Agent Battaglini, a CTDD consists of a plastic strip containing small hollow steel tubes. When a vehicle passes over a deployed strip, one or more of the tubes will dislodge from the strip, embed in a tire, and cause air to escape at a controlled rate of deflation.  A driver is able to retain control of the vehicle while tire deflation takes place and may continue driving for some distance.  On the approximately 100 prior occasions Agent Battaglini had personally deployed or witnessed the deployment of a CTDD, he had never observed a device cause an accident.[1]

After allowing for normal freeway traffic to clear and the Honda SUV to pass by points along eastbound I-8 where load vehicles had attempted to elude authorities in the past[2], the agents deployed a  CTDD was deployed to stop the Honda SUV. Once the CTDD was success- fully deployed Agents Blake and Salazar, who had been following the Honda SUV, activated the lights and sirens on their unmarked vehicles and the Honda SUV quickly pulled to the shoulder of the freeway just west of Yuma.

Agents Salazar and Blake, respectively, approached the passenger and driver sides of the stopped Honda SUV from the rear and with their service firearms drawn[3].  When the passenger, Defendant Moytez-Pineda open the passenger door, a strong odor of marijuana was detected by

---

[1]Agent Battaglini did testify that he once observed a vehicle roll over while trying to evade a CTDD.

[2]The Honda SUV traveled approximately 15 miles on Interstate 8 at the approximate speed of 60 mph before it was ultimately stopped.

[3]Testimony from the several agents established that it was generally understood by all that it was to be a felony stop, with weapons drawn and suspects handcuffed. This procedure had become the standard method of apprehension of suspected load vehicles emerging from the Buttercup Valley area under similar circumstances. Testimony of the agents was consistent in that in all such cases the vehicles stopped were ultimately determined to be marijuana load vehicles.

Agent Salazar.  As Defendant Moytez-Pineda stepped out of the vehicle, Agent Salazar observed bundles behind the seat which he believed to contain marijuana. Agent Blake noticed a strong odor of marijuana when the driver, Defendant Payan-Valenzuela, opened his door. Both Defendants were placed on the ground and handcuffed.  Each Defendant was questioned regarding immigration status without being <u>Mirandized</u> and admitted, in essence, to being a Mexican citizen with no authorization to be in the United States.  Defendants were placed under arrest and transported separately in unmarked vehicles to the Calexico-U.S. Border Patrol station.[4]

### *Advisal of Administrative and Miranda Rights*

At the June 1, 2007 evidentiary hearing, Agent Salazar testified he was unable to recall whether he advised Defendants of their administrative removal rights (or whether he used Form I-826 in connection therewith), although he did testify it was his custom and practice to do so when encountering a deportable alien. The relevance of this line of questioning, vigorously pursued by counsel for Defendant Moytez-Pineda, was that if such an administrative advisal had been given before any <u>Miranda</u> warning, the administrative advisal that counsel could be present, but not at government expense, would conflict with the standard <u>Miranda</u> admonition thereby creating confusion for the Defendant.  As such, counsel argued, the rule of <u>United States v. San Juan-Cruz</u>, 314 F.3d 384 (9th Cir. 2002) would come into play.  (Holding that a <u>Miranda</u> advisement of the right to appointed counsel must be clear and not subject to any equivocation resulting from a prior or contemporaneous administrative advisal of the right to have an attorney present, but not at government expense.)

Later, at the July 26, 2007 evidentiary hearing, Agent Salazar testified that following the June 1 hearing he conducted further investigation into whether and when he provided any administrative removal rights to either Defendant. In fact, Agent Salazar was able to retrieve an I-826 form he utilized to advise each Defendant of his administrative rights.  Agent Salazar further testified that the times entered on each form (6 p.m. for Defendant Moytez-Pineda and 7

---

[4]Although the testimony was unclear on the objects used to cover Defendants' heads during transportation, it seems clear that either a hood or an article of clothing was thus utilized for each Defendant in order to prevent their observations of the unmarked vehicles used in this case.

06cr2158

1  p.m. for Defendant Payan-Valenzuela) reflected the times the forms were input into a computer

2  and not when the administrate advisements were given.  Agent Salazar then elaborated that it

3  had always been his practice, without exception, to issue administrative rights after <u>Miranda</u>

4  rights when the agent was aware, as in this case, that the case was being processed as a criminal

5  case.  Defendant Moytez-Pineda testified briefly that the Form I-826 was shown to him by Agent

6  Salazar at approximately 6:00 to 6:30 p.m. and that he was later interviewed by DEA agents.

7  Defendant Moytez-Pineda was able to identify his signature on the I-826 form. On cross-

8  examination, Defendant Moytez-Pineda testified that he cannot read.

9      Agent Michael Ortiz of the Drug Enforcement Administration responded to the Calexico

10  Border Patrol station at approximately 8:15 p.m. on September 20, 2006.  At approximately 8:50

11  p.m., the <u>Miranda</u> admonition was provided to Defendant Moytez-Pineda by DEA agent

12  Vasquez through the use of a standard "<u>Miranda</u> card".  Defendant Moytez-Pineda acknowl-

13  edged his <u>Miranda</u> rights and then agreed to speak whereupon he gave a statement.[5]

14      Following the completion of Defendant Moytez-Pineda's interview, Agent Ortiz next

15  advised Defendant Payan-Valenzuela of his <u>Miranda</u> rights. Defendant Payan-Valenzuela

16  indicated he understood and waived his <u>Miranda</u> rights.  He then provided a statement. The

17  interview of Defendant Payan-Valenzuela then began at approximately 9:30 p.m. and concluded

18  at approximately 10:00 p.m.

19                                  ***Discussion***

20      The parties in this case fundamentally disagree on how the threshold analysis for these

21  motions to suppress evidence and statements should be structured.  The government submits that

22  only reasonable suspicion was required for Defendants' vehicle to be stopped and further that the

23  use of a CTDD was justified under either a reasonable suspicion or probable cause standard.

24  Defendants contend, alternatively, that probable cause at the very least was required for the stop

25

26      [5]Neither Defendant claims his <u>Miranda</u> advisement was in any way deficient or that any
27  statement was the product of coercive tactics at the time of the interviews. Rather, Defendants argue the manner in which their vehicle was stopped tainted their later statements and that the rule of <u>San Juan-Cruz</u> was violated.
28      Agent Ortiz testified that Defendants were calm during their respective interviews, were provided food and beverage as required and communicated appropriately.

06cr2158

and, moreover, given the use of the CTDD and drawn weapons, the more appropriate standard should have been one of clear and convincing evidence that narcotics were being transported in the vehicle.

Defendants further argue that the "field questions" asked of Defendants relating to citizenship status were impermissible due to the asserted unconstitutional stop of the vehicle and that later post-<u>Miranda</u> statements were tainted by the stop. The government responds that the "field questions" were proper and that neither the stops nor the field questioning render the post-<u>Miranda</u> statements inadmissable.

After careful consideration of all the evidence addressed regarding these motions as well as the written submissions and oral arguments, this court finds that although only reasonable suspicion was required for the stop of the vehicle in which Defendants were occupants, the stop was justified under either a reasonable suspicion or probable cause standard.

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government and the reach of that protection extends to investigatory stops of people and vehicles that fall short of arrests.  <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002).  Reasonable suspicion exists for an investigatory stop of a vehicle when the officer is aware of specific articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that the person to be detained has committed or is about to commit a crime. See <u>United States v. Cortez</u>, 449 U.S. 411, 417-418 (1981); <u>United States v. Salinas</u>, 940 F.2d 392, 394 (9th Cir. 1991). Facts are to be interpreted in light of the experience of a trained officer, and the entirety of relevant circumstances must be considered. <u>United States v. Sokolow</u>, 490 U.S.1, 7-8 (1989).

The Supreme Court has established a non-exclusive list of factors upon which an officer may rely in concluding reasonable suspicion exists: (1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including obvious attempts to evade officers; (6) appearance or behavior of the passengers; (7) model and appearance of vehicle; and (8) officer experience. <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 885 (1975).  However, the "totality of the circumstances" of each case must be considered to determine whether the detaining officer

1  has a particularized and objective basis for suspecting illegal activity.  United States v. Arvizu,

2  534 U.S. 266, 273-274 (2002).

3        Here, the factors supporting reasonable suspicion to stop and detain Defendants' vehicle

4  were numerous and compelling. The STAT unit conducting surveillance into the Buttercup area

5  on September 20, 2006 consisted of several highly experienced Border Patrol agents familiar

6  with smuggling activity in this area with close proximity to the border.  These agents knew how

7  to conceal themselves and what signs to look for indicating smuggling activity.  Before

8  September 20, 2006, the agents had become familiar with the looping maneuvers of scout

9  vehicles on Interstate 8 adjacent to Buttercup, as well as ATV riders riding scout in the dunes in

10  advance of a load vehicle emerging from Buttercup Valley into Buttercup campground.  On

11  September 20, 2006, after approximately eight hours of continuous surveillance, the STAT team

12  detected suspicious scouting activity.  Because no vehicular traffic had entered the Buttercup

13  area earlier, the agents quickly and justifiably concluded that Defendants' vehicle, a Honda

14  SUV, emerging from the dunes with blacked out windows, missing a front license plate as well

15  as the customary flag required of off-road vehicles, was in fact, a narcotics load vehicle which

16  had entered the United States by illegally crossing the border at the lower Buttercup area.

17        The scouting activity, the manner in which the Honda SUV was being operated, the

18  vehicle's appearance all fit the familiar and specific profile for drug smuggling. The determina-

19  tion of the agents was buttressed by their experience in which virtually every vehicle of the

20  many vehicles stopped under similar circumstances had been determined to be smuggling

21  narcotics.  Reasonable suspicion abounded to strip the vehicle on Interstate 8 and detain

22  Defendants[6].

23        Defendants urge the court to conclude that the use of the CTDD and drawn weapons in

24  this case was unreasonable and overly intrusive under the Fourth Amendment. Under the

25  circumstances presented, however, neither the use of the CTDD before agents activated their

26  emergency equipment, nor their use of firearms upon initial contact with Defendants constituted

27

28       [6]Given the compelling factors supporting a determination that the vehicle was smuggling drugs, the stop and detention would have been justified even under the higher standard of probable cause.

06cr2158

1  excessive force. The evidence before the court is that past use of this CTDD, or spike strip, had

2  resulted in the slow and controlled reduction of air from a tire, rather than tire blow-outs or

3  vehicle accidents.  Moreover, the testimony of the agents supported the decision to wait until

4  Defendants' vehicle had passed certain escape points used by past load vehicles and was clear of

5  legitimate traffic. The tactical use of the CTDD allowed the agents to bring the vehicle to a point

6  of rest at an optimum location while reducing the potential for escape and risk to other traffic.

7  See United States v. Hernandez-Garcia, 284 F.3d 1135, 1140 (9th Cir. 2002).  (Holding no basis

8  for invalidating an arrest or suppressing evidence where a CTDD was deployed under similar

9  circumstances).

10      Next, neither the use of drawn firearms in the approach of this vehicle, nor the initial use

11  of handcuffs converted the stop into a custodial arrest or Fourth Amendment violation. United

12  States v. Cervantes-Flores, 421 F.3d 825 (9th Cir. 2005) (Circumstances justified use of

13  handcuffs in a Terry stop without converting the contact into an arrest); United States v.

14  Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(permitting the display of firearms and the use

15  handcuffs during a Terry stop when officers had reason to believe the suspect was dangerous).

16  Here, the high probability that Defendants were smuggling a load of narcotics into the United

17  States from Mexico justified the agents' decision to make a felony stop of the vehicle. The use of

18  drawn weapons and handcuffs enhanced the ability of the agents to quickly control the scene,

19  prevent escape, and retrieve risk of injury to the public as well as defendants.

20      Once Defendants were removed from the vehicle it became quickly apparent to the agents

21  from the strong odor of marijuana emanating from the vehicle and their observations of packages

22  in the rear seat area that Defendants were smuggling marijuana. The continued detention of

23  Defendants, as well as the roadside questioning of Defendants into their immigration status was

24  entirely justified. Berkemer v. McCarty, 468 U.S. 420, 435-40 (1984) (roadside questioning of a

25  motorist detained pursuant to a traffic stop does not constitute custodial interrogation for

26  Miranda purposes); United States v. Galindo-Gallegos, 244 F.3d 728, 730-732, (9th Cir.

27  2001)(border patrol agents' apprehension of Defendant and their questioning of his immigration

28  status was a proper Terry stop); United States v. Camargo, 177 F.3d. 1113, 1121-23 (9th Cir.

1   1999) (immigration questioning of detainee following vehicle stop did not amount to custodial

2   interrogation).  Any statements made by Defendants regarding their immigration status were

3   properly obtained and admissible.

4           Next, Defendants urge this court to suppress later post-<u>Miranda</u> statements due to the

5   manner in which the vehicle stop was conducted, the fact that the heads of Defendants were

6   covered while they were transported to the Border Patrol station, and because Defendants were

7   allegedly advised of their administrative rights in a manner that may have undermined the

8   message of the <u>Miranda</u> advisement.

9           This court has already analyzed and approved the manner in which Defendant's vehicle

10  was stopped and Defendants were arrested.  The use of hoods or articles of clothing to cover

11  Defendants' faces during transportation in order to protect the identity of the undercover

12  vehicles appeared justified under the circumstances. There is no evidence before the court that

13  this protective measure was pre-textual, coercive, or in any manner a factor in Defendants'

14  decisions to provide post-Miranda statements.  The motion to suppress statements, insofar as it is

15  predicated upon the use of hoods or clothing to impair the vision of Defendants during

16  transportation, is denied.

17          Finally, we reach the issue of whether Defendants' post-<u>Miranda</u> statements should be

18  suppressed either because (1)the <u>Miranda</u> advisement was unclear due to the timing of the

19  administrative advisement, or (2) the statements were involuntary.

20          Defendants urge this court to find that they were each advised of their administrative

21  rights before their respective <u>Miranda</u> advisements or in such a way as to have created confusion

22  of the type criticized in <u>U.S. v. San Juan-Cruz</u>, 314 F.3d 384, 388-89 (9th Cir. 2002) (a <u>Miranda</u>

23  warning is defectively unclear when it is preceded by an advisal of administrative removal rights

24  wherein the individual is informed there is no right to government provided counsel).  The

25  difficulty with Defendants' argument, however, is that it is dependent upon this court finding

26  that their <u>Miranda</u> warnings were conveyed in the manner condemned by <u>San Juan-Cruz</u>.

27  Although the initial testimony of Agent Salazar demonstrated his inability to recall whether he

28  utilized a certain form (I-826) in providing to Defendants their administrative removal advisal,

06cr2158

1   as well as other details, his subsequent investigation refreshed his memory on these points.

2   Agent Salazar was later able to provide copies of the I-826 forms he used to process Defendants

3   for administrative purposes and to testify as to his use of the forms.  Agent Salazar was

4   vigorously cross-examined on the I-826 forms he utilized for Defendants as well as on his

5   refreshed memory that he provided administrative advisals *after* the post-Miranda interviews of

6   Defendants conducted by DEA agents.  Agent Salazar testified that in order to specifically avoid

7   the prospect of an unclear Miranda warning (as discussed in San Juan-Cruz) it was his consistent

8   practice to defer the giving of an administrative removal admonition until after the Miranda

9   warnings and any interview into possible criminal wrongdoing.  After Agent Salazar's testimony

10   regarding the I-826 forms (including his explanation of the 6:00 p.m. and 7:00 p.m. posted times

11   on the forms) and his custom and practice of deferring the administrative warning until after the

12   Miranda interview period, this court finds that the weight of the evidence establishes no San

13   Juan-Cruz error occurred[7].

14      The preponderance of evidence before the court establishes that Defendants were each

15   properly advised of their Miranda rights and that each knowingly, voluntarily, and intelligently

16   waived those rights at the time they provided statements to DEA Agent Ortiz.  Moreover, the

17   evidence establishes that each of the Defendants was interviewed by Agent Ortiz in a non-

18   coercive manner and environment.

19      For all of the foregoing reasons, the motions to suppress evidence and statements are

20   denied in their entirety as to each Defendant.

21      IT IS SO ORDERED.

22

23   DATED:  September 14, 2007

24   _____

25   Hon. Jeffrey T. Miller
     United States District Judge

26

27      [7]Agent Salazar's testimony on this subject was more credible than that testimony of Defendant
     Moytez-Pineda.  Defendant Moytez-Pineda did not note the time he reviewed the I-826 Form with
28   Agent Salazar, and did not testify as to any confusion about his Miranda right to have government
     counsel appointed for him.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28